# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF WISCONSIN

DANIEL M. ANDREOLA, SR.,

        Plaintiff,

    v.                                  Case No. 04-C-0282

STATE OF WISCONSIN, *et al.*,

        Defendants.

---

### ORDER CLARIFYING ISSUES FOR TRIAL

---

Plaintiff Daniel M. Andreola, Sr., a state prisoner, brought this civil rights action under 42 U.S.C. § 1983, alleging that defendants violated his rights by failing to provide him with kosher food. Specifically, plaintiff, who claims he is Jewish, alleged that when he entered Dodge Correctional Institution (DCI), he requested a kosher diet but received the same meals as other inmates. Plaintiff was later transferred to Oshkosh Correctional Institution (OSCI) where, he alleged, he received "kosher" meals that did not meet his definition of kosher and that contained different food items than the meals served to other inmates. Plaintiff sought compensatory damages as well as preliminary and permanent injunctive relief. Named as defendants were the State of Wisconsin and officials ranging from Governor James Doyle to the food services administrators directly responsible for plaintiff's diet.

On July 2, 2004, this court denied plaintiff's motion for a preliminary injunction directing officials at OSCI to provide him meals according to a regime he describes as "ultra Orthodox" and ordered plaintiff to show cause why summary judgment should not be entered for defendants on all

plaintiff's claims. After considering the parties' submissions, the court on March 28, 2005, granted summary judgment on plaintiff's claims relating to his incarceration at OSCI for failure to exhaust his administrative remedies at that institution, but permitted plaintiff's DCI claim to continue against officials at that prison. On July 2, 2005, the remaining defendants moved for summary judgment on plaintiff's DCI claim. The court granted the motion on November 14, 2005, with respect to every defendant but Defendant Dennis Glass, the food services administrator directly responsible for plaintiff's diet at DCI. Plaintiff's claim against Defendant Glass is currently scheduled for trial on June 19, 2006.

On March 2, 2006, a final pretrial was held in the case. In the course of the hearing, both the court and the parties raised several issues concerning the what issues remain in the case, the scope of the trial and the possibility of the parties stipulating to certain facts. In addition, prior to the pretrial, both parties had submitted their respective trial briefs setting forth a list of witnesses and a brief summary of the area of testimony they expected the witness to cover. This order will address the issues raised both at and subsequent to the pretrial, clarify the issues remaining for trial, and dispose of several motions that remain pending.

**A. Impact of Seventh Circuit Decision Affirming Denial of Preliminary Injunction**

After the court denied plaintiff's motion for preliminary injunctive relief, plaintiff filed a notice of interlocutory appeal. Plaintiff attempted to mount a general challenge to the court's Order of March 28, 2005, despite this court's warning that an appeal from the court's order, other than that portion denying his motion for injunctive relief, was premature. (Order of April 15, 2005, at 3.) The Seventh Circuit agreed and ordered that plaintiff's appeal was "LIMITED to a review of the district court's March 28, 2005 denial of plaintiff's motions for injunctive relief," and held that

2

plaintiff's appeal of the dismissal of his claims at OSCI was "premature." *Andreola v. State of Wisconsin*, No. 05-1931, unpublished order at 1 (7th Cir. June 21, 2005). The Seventh Circuit affirmed this court's denial of plaintiff's motion for preliminary injunctive relief on February 17, 2006. *Andreola v. State of Wisconsin*, No. 05-1931 (7th Cir. Feb. 17, 2006) (unpublished order). In so ruling, however, the Court noted:

> The warden and other officials at Oshkosh Correctional Institution, where Andreola was confined when the suit began, are proper defendants but play no role in this appeal because Andreola has been transferred to Oakhill Correctional Institution. The claim against these officials is not moot in light of the demand for damages, but this appeal is limited to equitable relief. Andreola's claim against more senior personnel in the Department of Corrections [DOC] is proper under *Ex parte Young*, 209 U.S. 123 (1908), and is not moot because they can control his diet throughout the state's prison system.

*Id.* at 1. The court also noted that it was not addressing plaintiff's argument that he was entitled to relief under the Religious Land Use and Institutionalized Person Act (RLUIPA), 42 U.S.C. § 2000cc-1(a), "because he did not rely on that statute in the district court." *Id.* at 2. The court stated, however, that "[i]n considering Andreola's request for damages and a permanent injunction, the district court should turn first to RLUIPA, because statutory arguments come ahead of constitutional ones." *Id.*

In light of the Court of Appeals' comments concerning the continued viability of damage claims against officials at OSCI and the claims for permanent injunctive relief against senior officials of the Department of Corrections, this court asked the parties to address the question whether there was a need to vacate my previous order dismissing plaintiff's claim against those officials for failure to exhaust. The court also inquired in light of the Court of Appeals' comments, whether plaintiff's claim should now be considered under RLUIPA, even though he had not

3

previously raised it in this court. The parties were invited to advise the court as to their positions on these issues and they have now done so.

Plaintiff argues that the Seventh Circuit's disposition of his interlocutory appeal directed this court to reinstate his OSCI claims as well as his claim for injunctive relief against the senior DOC officials. He claims that the exhaustion of his administrative remedies concerning his DCI claim satisfies the exhaustion requirement for his claim arising out of his dispute with OSCI officials as well. He also contends that it is clear from the Seventh Circuit's order in this matter that his claim against senior DOC officials also survives. The court disagrees. The Seventh Circuit's jurisdiction was confined to this court's denial of plaintiff's motion for preliminary injunctive relief. Although the Seventh Circuit's comments assumed plaintiff's claims against OSCI and senior DOC officials were still in the case, it is unclear whether the Court's comments refer to the time prior to the dismissal of those claims on other grounds. In any event, even though the Seventh Circuit did not reverse this court's ruling dismissing Andreola's claim against the OSCI officials and senior DOC officials, the court will review its earlier order in the interest of correcting any error that may have occurred.

In its March 28, 2005 Order, the court dismissed plaintiff's claim against the OSCI officials without prejudice on the ground that plaintiff had failed to exhaust his administrative remedies as to that claim. In so ruling, the court rejected plaintiff's argument that by exhausting his administrative remedies with respect to his claim at DCI, he had satisfied any exhaustion requirement at OSCI. The court stated at that time:

> A complaint about the alleged failure of the DCI defendants to provide any kosher food to the plaintiff did not alert the OSCI defendants that the purportedly kosher meals with which they provided plaintiff did not satisfy his dietary demands. As a

4

result, the OSCI defendants had no opportunity to address the plaintiff's complaint internally.

(March 28, 2005 Order at 19.)  The court now confirms its earlier ruling.

In order to exhaust administrative remedies, a prisoner "must have clearly given the institution notice of his particular demands and reasonably triggered an attempt to resolve them." *McCoy v. Gilbert*, 270 F.3d 503, 512 (7th Cir. 2001).  The purpose of the exhaustion requirement is "to permit the prison's administrative process to run its course before litigation begins." *Cannon v. Washington*, 418 F.3d 714, 719 (7th Cir.2005) (per curiam).  The hope is that "corrective action taken in response to a grievance might satisfy the prisoner, thus obviating the need for the litigation, or alert prison authorities to an ongoing problem that they can correct." *Dole v. Chandler*, 438 F.3d 804, 809 (7th Cir. 2006).

Plaintiff's administrative complaint at DCI did not satisfy the exhaustion requirement for his complaint at OSCI because his complaint at DCI was different from his complaint at OSCI. *Compare* Affidavit of Sandra Habeck (Docket # 47) with Affidavit of Dennis Glass (Docket # 67). At DCI, plaintiff's complaint was that he was not given a kosher diet at all, whereas his complaint at OSCI is that the kosher diet he received did not meet the "ultra Orthodox" standard of his religious faith.  (Am. Compl. ¶¶ 2-8 and 9-18.)  In addition, the food service administrators and personnel responsible for providing his kosher diet at the two institutions were not the same.  This was not a case where the inmate's claim remained the same as he was transferred from institution to institution.  *Compare Greeno v. Daley*, 414 F.3d 645, 652 (7th Cir. 2005) (holding that inmate complaining of failure to treat same health condition has exhausted once he has pursued single complaint through all steps of prison grievance system).  In light of the different facts and

5

circumstances at the two institutions, the court concludes that the claims were separate and distinct. Plaintiff was required to file a grievance at OSCI and pursue his administrative remedies before filing a federal lawsuit against the OSCI officials. By failing to do so, he deprived the OSCI officials of an opportunity to resolve his grievance before litigation was commenced. His claim against the OSCI officials was therefore properly dismissed without prejudice.

On the other hand, even if the court's conclusion that plaintiff failed to exhaust his administrative remedies as to his OSCI claim was in error, it would have reached the same result on the merits. In his amended complaint, plaintiff asserted two claims against the defendants, both arising under the United States Constitution. The first was that the defendants had violated his First Amendment right to the free exercise of his religion by failing to provide him a kosher diet. Plaintiff's second claim was that the defendants violated his Fourteenth Amendment right to equal protection because the diet he received at OSCI did not include kosher versions of food items served to inmates who had not requested religious diets. The court explained in its March 28, 2005 Order that plaintiff failed to state an equal protection claim since there was obviously a rational basis for his receiving a different diet than other inmates – namely, his request for a kosher diet. (March 28, 2005 Order at 20-21.) The court also held that the discrepancies alleged did not arise to the level of a constitutional violation. *Id.* The court now concludes that plaintiff's First Amendment claim fails as well.

Plaintiff's First Amendment claim is governed by *Turner v. Safley*, 482 U.S. 78 (1987), and *O'Lone v. Estate of Shabazz*, 482 U.S. 342 (1987). Both cases stand for the proposition that prison rules and regulations alleged to burden inmates' constitutional rights are to be judged under a reasonableness standard. A regulation or practice will be upheld "if it was reasonably related to

6

legitimate penological interests." *Turner*, 482 U.S. at 89. *Turner* also sets out four factors to consider in making this determination. "First, there must be a 'valid, rational connection' between the prison regulation and the legitimate governmental interest put forward to justify it." *Id.* (*quoting Block v. Rutherford*, 468 U.S. 576, 586 (1984)). The second factor to consider is "whether there are alternative means of exercising the right that remain open to prison inmates." 482 U.S. at 90. The third factor is "the impact accommodation of the asserted constitutional right will have on guards and other inmates, and on the allocation of prison resources generally." *Id.* And finally, the presence or absence of ready alternatives that fully accommodate the prisoner's rights at *de minimis* cost to valid penological interests. *Id.* at 90-91.

In *Turner*, the Court was confronted with a prisoner's challenge to restrictions on the right of inmates to correspond with other inmates and to marry, neither of which are at issue here. However, in *O'Lone* the Court applied the *Turner*'s reasonableness standard to a claim by inmates that prison regulations interfered with their First Amendment right to exercise their religion. In *O'Lone*, a group of Islamic prisoners challenged a policy adopted by prison officials that interfered with their attendance at Jumu'ah, a weekly Muslim congregational service commanded by the Koran. Applying the test it had set out in *Turner* only a week earlier, the Court found that the policy had a logical connection to the institutional interest in maintaining institutional order and security since it was designed to ease tension and the drain on the facilities and personnel during that part of the day when the inmates were outside the main building. The Court noted that "the very stringent requirements as to the time at which Jumu'ah may be held make it extraordinarily difficult for prison officials to assure that every Muslim prisoner is able to attend that service." *Id.* at 351. While it did not minimize the importance of Jumu'ah to Muslim prisoners, the Court nevertheless

7

concluded that the fact that other ways of exercising their religion remained open to them supported its conclusion that the challenged regulation was reasonable. Finally, the Court concluded that accommodation of the Muslim prisoner's request would have an adverse impact on other inmates, on prison personnel, and on allocation of prison resources. Reaffirming its "refusal, even where claims are made under the First Amendment, to substitute our judgment on . . . difficult and sensitive matters of institutional administration, . . . for the determination of those charged with the formidable task of running a prison," the Court concluded that the regulations were reasonably related to legitimate penological objectives.

Applying the reasonableness test to the undisputed facts of this case, the court concludes that the OSCI defendants did not violate plaintiff's free exercise rights. The affidavit of Sandra Habeck, Food Services Administrator at OSCI, describes in detail food service operation and the efforts made by the institution to provide plaintiff a kosher diet. According to Habeck, "OSCI Food Services is a large scale food service operation responsible for producing about 7,000 meals a day of [which] approximately 1,200 are considered 'special diets,' for medical or religious reasons." (Habeck Aff. ¶ 9.) At the time plaintiff arrived at OSCI, religious diets for inmates were governed by Internal Management Procedure Number DOC 309 IMP 6B (hereafter "IMP 6B"), which became effective November 7, 2002. (*Id.*, Ex. 1001.) IMP 6B sets forth the policy of the DOC with respect to religious diets: "The Division of Adult Institutions will make religious diets available through standard menu alternatives as resources permit for inmates whose religious beliefs require the adherence to religious dietary laws." (*Id.* at 1.) To receive a religious diet inmates must submit a request which is then reviewed and approved by the institution Chaplain, or his or her designee. IMP 6B explicitly states that upon approval of their request, Jewish inmates will receive a kosher

8

diet, which is defined as "[a] diet prepared and served in accordance with the religious diet requirements of Judaism." (*Id.* at 1.)

With respect to plaintiff's request, Habeck notes it was approved on January 23, 2004, and he began receiving kosher meals on February 2, 2004. (Habeck Aff. ¶¶ 7, 10.) "His meals most commonly consist of nonfat dry milk to be mixed with water, fresh and/or canned fruits and vegetables, fruit and vegetable juices, mashed potatoes, meat-based prepackaged meals, hard boiled eggs, green salads, fruit cocktail and graham crackers." (*Id.* ¶ 10.) Except for parve (neutral) foods, such as fresh vegetables, fresh fruits, eggs, etc., all food products served to plaintiff and other Jewish inmates were purchased by Habeck through reputable companies and entities who certify and properly label the food products as kosher. (*Id.* ¶ 11.) In addition, kosher labeled products, such as nuts, condiments, coffee, cookies, and canned goods, were available through the OSCI canteen. (*Id.* ¶ 12.)

Plaintiff does not dispute Habeck's claim that he was provided such food at OSCI. Instead, he argues that it was not enough; that despite its efforts, OSCI failed to provide him an authentic kosher diet that meets the requirements of Orthodox Judaism. In order to meet those requirements, plaintiff contends, the preparation of Kosher food must be supervised "by a person competent in the laws of Kosher Food." (Pl.'s Reply to Mot. for Summ. J. at 1.) In addition, plaintiff notes that "keeping kosher" requires special procedures by which allowable foods are prepared for consumption, served and stored. Several examples of these special procedures were provided by a Colorado district court in a case plaintiff cites in support of his position:

> For example, kosher food is no longer "kosher" if it is prepared in containers which have held non-kosher food. To keep kosher foods untainted, containers, pots and pans, utensils, and all other implements used in their preparation must not come into

9

contact with any item that is or has had contact with nonkosher food. Also, to keep kosher food "kosher," it must be served on plates and bowls and eaten with utensils which have not had non-kosher contact.

*Beerheide v. Zavaras*, 997 F. Supp. 1405, 1408-09 (D. Colo. 1998). In response to an injunction directing the Colorado Department of Corrections to provide kosher meals to Jewish inmates, prison officials in *Beerheide* set up a modified kosher kitchen within the regular prison kitchen. One of the plaintiff inmates began working in the kitchen in a special locked and caged area set aside for the preparation of the kosher food trays for himself, and his co-plaintiffs. In addition, prison officials "provided a microwave oven, preparation table, two cutting boards, two nondisposable knives, one pot, one pan, plastic tubs, plastic storage drawers, plastic wear and trays, butcher paper, and aluminum foil for exclusive use in the preparation of the kosher meals." *Beerheide v. Suthers*, 286 F.3d 1179, 1183 (10th 2002). Plaintiff contends that these same procedures must be followed by OSCI in order to avoid any infringement of his First Amendment right to exercise his religion. He cites the Tenth Circuit's decision affirming the district court's issuance of the injunction in *Beerheide* as support for his position. (Plt. Reply Docket #60 at 2.)

Of course, a decision by the Tenth Circuit is not controlling in this case. Notwithstanding the Tenth Circuit's decision in *Beerheide*, most courts that have addressed the issue of a prison's obligation to provide prisoner's religious diets under the First Amendment have held that while some accommodation might be required, prisoners are not entitled to meals prepared in strict accordance with the dietary laws of their religion. As one court faced with a similar claim by a Muslim prisoner concluded from its own review of the decisions of the various courts that had addressed the issue, "the vast majority of these courts ha[ve] determined that a prison permissibly discharge[s] its constitutional duty to respect the dietary beliefs of Muslim inmates by offering an

10

alternative, pork-free diet, and more broadly, that the law permit[s] prison authorities to limit the dietary options available to prisoners in the interests of reducing the costs and burdens entailed in accommodating the smorgasbord of food-related religious beliefs likely to be encountered in a prison population." *Hudson v. Maloney* 326 F. Supp. 2d 206, 211 (D. Mass. 2004).

In *Kahey v. Jones*, 836 F.2d 948, 949 (5th Cir. 1988), for example, the Fifth Circuit was confronted with a prisoner's demand "to have the prison prepare not just a non-pork diet, but a specially-tailored menu in a special way to accommodate her practice of Islam." In rejecting the prisoner's claims, the Fifth Circuit reaffirmed its pre-*Turner* holding in *Udey v. Kastner*, 805 F.2d, 1218 (5th Cir. 1986), "that prisons need not respond to particularized religious dietary requests.*" Kahey*, 836 F.2d at 950. In *Udey*, the court had held that the prison was justified in denying the prisoner's request for a diet consistent with his religious beliefs based on "the probable proliferation of claims, and the concomitant entanglement with religion that processing multiple claims would require." 805 F.2d at 1220. As the *Kahey* court explained:

> if one such dietary request is granted, similar demands will proliferate, with two possible results: either accommodation of such demands will place an undue burden on the prison system, or the prisons would become entangled with religion while drawing fine and searching distinctions among various free exercise claimants.

836 F.2d at 950. In reaffirming *Udey*, the *Kahey* court analyzed the issue in light of the factors highlighted by the Court in *Turner*. First, the court noted that the regulation served "a legitimate governmental interest in running a simplified prison food service rather than a full-scale restaurant." *Id*. Second, the court noted that, as in *O'Lone*, other forms of exercising her religion were available. *Id*. at 951. With respect to the potential impact on guards, other inmates and the allocation of prison resources, the court noted that the prison was "understandably reluctant not only to provide special

11

food, but to devote special storage facilities, utensils and preparation effort to supplying Kahey's diet." *Id.* As similar requests arose, the court noted, "the expense and diversion of resources from other penological goals could be considerable." *Id.* This could result in the perception among other inmates that Kahey was being favored which would have an adverse impact on prison morale. In light of these considerations and since the cost of the alternative Kahey had suggested – providing food in hulls or shells served on paper plates – would not be *di minimus*, the court concluded the prison official's refusal to accede to the prisoners demands was reasonable. *Id. See also Williams v. Morton*, 343 F.3d 212 (3rd Cir. 2003) (holding failure to provide Halal meals to Muslim inmates did not violate their free exercise rights).

The law in this circuit appears similar. In *Hunafa v. Murphy*, 907 F.2d 46 (7th Cir. 1990), the Seventh Circuit reversed the district court's summary judgment dismissing the claim of a Muslim prisoner that his free exercise rights were violated when the prison officials failed to take adequate precautions to insure that the non-pork meals served to him when he was placed in segregation were not contaminated by the pork served to non-Muslim inmates during transit to the cells.[1] In so ruling, the court cited the Fifth Circuit's decision in *Kahey*, but distinguished it, noting that the prisoner's demands in that case were "far more taxing than Hunafa's appear to be," 907 F.2d at 47, and that "the defendants advanced detailed objections based on cost and feasibility." *Id.* at 48. And in this very case, in its order affirming this court's decision denying plaintiff's motion for a preliminary injunction, the Seventh Circuit noted:

---

[1]The court noted that *Employment Division v. Smith*, 494 U.S. 872 (1990), "cut back, possibly to minute dimensions, the doctrine that requires government to accommodate, at some cost, minority religious preferences," and commended the issue to the parties and the district court on remand. *Hunafa*, 907 F.2d at 48. Thus, it is unclear whether the Seventh Circuit would reach the same result on a full record.

12

> Wisconsin is providing Andreola with a diet that would be accepted as kosher by most Jews. Although Andreola does not find this satisfactory, the first amendment does not require prisons to accommodate every element of each inmate's faith; there are so many variations that the enterprise would be both costly and unavailing (for perfect implementation cannot be assured at any cost). It also would open the system to abuse, for prisoners might make "religious" demands motivated more by matters of taste than matters of faith. We do not say that Andreola has done this, but the rule must be general. Many decisions, of which *Johnson v. Horn*, 150 F.3d 276 (3d Cir. 1998), overruled on other grounds by *Dehart v. Horn*, 227 F.3d 47 (3d Cir. 2000), is an example, hold that it is enough to accommodate religious dietary needs shared by a significant number of prisoners; inmate-specific diets are not required.

*Andreola*, No. 05-1931, unpublished order at 2.

Based on the foregoing, and contrary to the Tenth Circuit's decision in *Beerheide*, the court concludes that Wisconsin prison officials have no duty under the First Amendment to create a separate "kosher" kitchen to serve plaintiff and other Jewish inmates. A kosher kitchen is one that has designated areas for meat and foods that contain meat, and a separate area for dairy foods. (Aff. of Christine A. Althaus ¶ 20.) The separate areas require not only separate floor space, but also separate storage space and equipment, such as ovens and utensils used to prepare food. (*Id.*) The budgetary and logistical problems that would be involved in setting up and operating such a kitchen are obvious. In addition to the budget and space constraints under which prisons operate, staffing kosher kitchens with individuals trained in the numerous food preparation dietary laws that apply to kosher food preparation and equipment handling in an area with a small Jewish population would be extremely burdensome, if possible to achieve at all. (*Id.* ¶ 21.)

The court also rejects plaintiff's claim that prison officials were required to grant his request that "he be allowed access to the OSCI kitchen in order to oversee the handling, preparation and serving of kosher meals to inmates." (Habeck Aff. ¶ 8.) Nor was OSCI required to appoint plaintiff "OSCI advisor on how kitchen staff, including other inmates, should prepare and serve kosher

meals." (*Id.*) Inmates are not allowed access to kitchen areas unless they are trained and assigned to work in Food Services. Inmates compete for Food Service positions so that they can work in the kitchen, but it would undermine safety and security to place an inmate in a position of authority over other inmates and staff. (Habeck Aff. ¶ 9.) For these reasons, and in light of the reasonable and extensive efforts OSCI expends in an effort to meet the religious dietary requests of inmates and the other ways in which inmates are allowed to practice their religion, the court concludes that the failure of OSCI to meet plaintiff's additional dietary demands was reasonable. Because under the First Amendment, reasonableness is the test, plaintiff's First Amendment claim fails.

Plaintiff also argues based on the Seventh Circuit's order affirming the denial of his motion for a preliminary injunction that he may now, for the first time, assert a claim under the Religious Land Use and Institutionalized Persons Act (RLUIPA), 42 U.S.C. § 2000cc *et seq.*, at trial. Defendants counter that any RLUIPA claim was waived by plaintiff's failure to raise it in opposition to their July 20, 2005, motion for summary judgment. Defendants' argument is not without merit. The purpose of a motion for summary judgment is to narrow the issues for trial where possible, even where the entire case cannot be resolved on the motion. *Leonard v. Socony-Vacuum Oil Co.*, 130 F.2d 535, 536 (7th Cir. 1942). That purpose is frustrated if the non-moving party is permitted to raise new issues for trial after the court has ruled on the motion. While plaintiff need not have pled the legal authority underlying his claims in his complaint, *Shah v. Inter-Continental Chicago Hotel Operating Corp.*, 314 F.3d 278, 282 (7th Cir. 2002), he was obliged to identify that authority once defendants moved for summary judgment. *Teumer v. General Motors Corp.*., 34 F.3d 542, 545-546 (7th Cir. 1994); *Carpenter v. City of Northlake*, 948 F. Supp. 759, 765 (N.D. Ill. 1996) ("[I]n

14

responding to a motion to dismiss or motion for summary judgment, the legal basis of the claim must be identified.").

It is also significant that this case has been pending more than two years and has gone through two rounds of summary judgment motions. Plaintiff has known of RLUIPA since at least January 5, 2005, when he first asserted it in a similar case he had pending in this district against the Sheriff of Rock County for failing to provide him an authentic kosher diet during the time he was incarcerated there awaiting trial. *Andreola v. Rock County*, Case No. 04-C-186. Yet, plaintiff made no mention of RLUIPA to this court in connection with this case until the time of the final conference, long after discovery in the case has closed.

That having been said, it is not clear how the assertion of a claim under RLUIPA at this point would prejudice the remaining defendant. It is true that RLUIPA significantly changes the standard by which the defendant's conduct would be judged. Instead of the reasonableness standard by which prison regulations that substantially burden the exercise of religion are judged under the First Amendment, *O'Lone*, 482 U.S. at 349, RLUIPA requires that such burdens be justified by "a compelling governmental interest" and that they be "the least restrictive means of furthering the compelling governmental interest." 42 U.S.C. § 2000cc-1; *Cutter v. Wilkinson*, 125 S. Ct. 2113, 2121 (2005). But the facts surrounding the alleged violation remain the same. Plaintiff either sincerely holds religious beliefs that require him to eat only kosher meals, or he does not. Glass either made some effort to provide plaintiff meals that were kosher, or as close to kosher as the circumstances allowed, or he did not. And Glass' reasons for failing to do more are what they are, whether they bear a reasonable relationship to legitimate penological interests, serve compelling governmental interests that cannot be met in any less restrictive manner, or do neither. It is not clear

15

why adding a different standard by which Glass' conduct will be judged requires further discovery or in any way prejudices the defense.

Moreover, the Federal Rules of Civil Procedure authorize amendment of pleadings to conform to the evidence "upon motion of any party at any time, even after judgment." Fed. R. Civ. P. 15(b). More generally, the Rules require that leave to amend "shall be freely given when justice so requires." Fed. R. Civ. P. 15(a). The fact that plaintiff is proceeding *pro se* is also significant since this requires that his pleadings be liberally construed and are held "to less stringent standards than formal pleadings drafted by lawyers." *Haines v. Kerner*, 404 U.S. 519, 520 (1972). Finally, given the liberal notice pleading theory underlying the Federal Rules of Civil Procedure, citation to RLUIPA in the complaint is not even required. Under notice pleading,

> Plaintiffs need not plead facts; they need not plead law; they plead claims for relief. Usually they need do no more than narrate a grievance simply and directly, so that the defendant knows what he has been accused of. Doe has done that; it is easy to tell what she is complaining about.

*Doe v. Smith*, 429 F.3d 706, 708 (7th Cir. 2005). Having clearly, if belatedly, asserted RLUIPA as a basis for the relief he is seeking, and in the absence of prejudice to the defense, the court concludes that plaintiff has not waived RLUIPA as to that part of his case that remains. It has been waived, however, as to those claims already dismissed. Parties that have already been dismissed should not be dragged back into this litigation on the basis of a claim the plaintiff failed to assert when they were still in the case.

**B. Plaintiff's Witness List**

The court has now received pretrial submissions, including witness lists from both parties with a brief summary of their anticipated testimony. Plaintiff's witness list is extensive with many

16

witnesses listed whose only involvement is with claims which the court has already dismissed or which were never part of this case. In addition, plaintiff has named as expert witnesses two rabbis who he expects to testify. Rabbi Michael Twerski from Milwaukee will testify about the tenets of the Jewish religion, including kosher food, and Rabbi Ensbry from Chicago is expected to testify on kosher food in an institutional environment. Plaintiff notes that each is to be paid $1,000 per day for their testimony, plus expenses. Finally, plaintiff has also named a Dr. Bridgewater, a board certified internist employed by the DOC, as an expert witness, but fails to state what the substance of his testimony might be. Dr. Bridgewater is also to be paid $1,000 per day plus expenses.

Although plaintiff has not made a specific request, it appears he expects the court to issue subpoenas for his requested witnesses and pay their attendance fees and travel expenses. *See* Fed. R. Civ. P. 45(b)(1). Effective service of a subpoena requires that the fees for one day's attendance and mileage allowed by law be tendered to the witness at the time of service. Failure to tender fees and mileage renders the subpoena invalid and frees the witness of any obligation to attend. Wright & Miller, *Federal Practice and Procedure*: Civil 2d § 2454 at 25-26 (West 1995); *see also CF & I Steel Corp. v. Mitsui & Co. (U.S.A.), Inc.*, 713 F.2d 494 (9th Cir. 1983); *Lindell v. Friday*, 2004 WL 225076, *1(W.D. Wis. Feb 02, 2004). Attendance by expert witnesses and the fees they are paid are generally determined by contract between the witness and the party calling the witness. In this case, plaintiff has been granted leave to proceed *in forma pauperis*. But it does not follow that the court or the government is required to subsidize plaintiff's lawsuit by paying the fees and expenses of his witnesses.

A party to a civil lawsuit has no constitutional right to payment of witness fees and expenses. *Johnson v. Hubbard*, 698 F.2d 286, 289 (6th Cir. 1983). Like those who are not serving a sentence

17

for a crime, prisoners have no constitutional right to appointed counsel and costs of litigation in civil cases, even if they are indigent. *Jackson v. County of McLean*, 953 F.2d 1070, 1071 (7th Cir. 1992) ("We begin with the fundamental premise that indigent civil litigants have no constitutional or statutory right to be represented by counsel in federal court."); *McNeil v. Lowney*, 831 F.2d 1368, 1373 (7th Cir. 1987) ("Moreover, the right of access to the courts does not independently include a waiver of witness fees so that the indigent litigant can present his case fully to the court."). While the Supreme Court has recognized a constitutional right of access to the courts, this right has so far not been extended to include a right to a government subsidy of all of the costs of litigation. In the words of the Sixth Circuit:

> we do not feel that such a right requires a court to grant every party a perfect trial in all aspects. Witness fees clearly fall in the category of items such as trial transcripts, depositions, and other documents, which the constitution does not require a court, or in practical terms, the federal government, to pay for at the request of the indigent party. Johnson is not barred from access to the courts simply because the court will not or cannot pay for all his witnesses to appear.

*Hubbard*, 698 F.2d at 289.

Certain language in 28 U.S.C. § 1915 suggests that in indigent prisoner does have a statutory right to government payment of witness fees and expenses. Subsection (d) provides that in cases in which prisoners are permitted to proceed *in forma pauperis*, "[t]he officers of the court shall issue and serve all process, and perform all duties in such cases. Witnesses shall attend as in other cases, and the same remedies shall be available as are provided for by law in other cases." 28 U.S.C. § 1915(d). However, in *McNeil*, the Seventh Circuit agreed with the Sixth Circuit that "[s]ection 1915 does not provide the necessary statutory authority for the waiver of Mr. McNeil's witness fees." 831 F.2d at 1373 (citing *Hubbard*, 698 F.2d at 290); *see also Lindell*, 2004 WL 225076 at

18

*1. True, at least one court in this district has held that § 1915(d) "requires subpoenas requested by IFP litigants to be issued at government expense 'as part of the operational expenses of the courts.'" *Coleman v. St. Vincent De Paul Soc.*, 144 F.R.D. 92, 95-96 (E.D. Wis.1992) (*quoting Hubbard*, 698 F.2d at 292 (Swygert, J., dissenting)). "However, the great weight of authority, including several court of appeals decisions, is to the contrary." Wright & Miller, *supra*, at 27. And of course, in light of this authority, it goes without saying that plaintiff has no right to government-funded expert witnesses.

In this respect, plaintiff is in no different position than a person who is not in prison who wishes to start a lawsuit. The high cost of litigation deters many people who may feel they have a strong case from starting a lawsuit. In modern times, it has been the willingness of attorneys to represent individuals on a contingency fee basis that permits most individuals to bring a lawsuit. Under a contingency fee arrangement, the attorney receives a percentage of any award as his fee. Often such arrangements call for the attorney to advance the expenses of litigation, such as witness fees, as well. Where the potential award of damages is substantial and the attorney assesses the case as having a reasonable likelihood of success, an investment of the attorney's time and money in the plaintiff's case will seem reasonable. In addition, Congress has provided that in cases brought under 42 U.S.C. § 1983, the defendant must pay the plaintiff's attorneys fees and costs if he prevails. Thus, even if plaintiff's damages do not appear substantial, an attorney is often willing to represent a person in such a case without prepayment of fees and costs if the likelihood of success appears sufficiently high. Here, however, it appears plaintiff never sought to retain counsel to represent him. Certainly, he never made such a request to the court. It thus appears that he will have to bear the cost of producing his witnesses himself.

19

In reviewing plaintiff's witness list, it appears that the only individuals who appear to have relevant testimony are Defendant Glass, Jeffrey Capelle, Paul Rodgers, Michael Berk, Cynthia Potts and Charles Charola. None of the witnesses from Oakhill Correctional Institution or OSCI have any testimony relevant to plaintiff's DCI claim to offer. Even the testimony of the rabbis appears unnecessary since the defendant has indicated he does not contest plaintiff's description of what constitutes authentic kosher food and the procedures required to store, prepare and serve it. In any event, there is no authority for the court to pay or order others to pay the fees required for such testimony. Upon plaintiff's request, the clerk shall therefore issue six subpoenas in blank to plaintiff.[2] It will then be plaintiff's responsibility to complete the subpoenas before service and to tender the amount of the witness fees and mileage. Plaintiff is advised that any potential witness who receives a subpoena from plaintiff that does not come with the witness fee and transportation costs may move to quash the subpoena for that failure. The court would be bound to grant such a motion. *See Lindell*, 2004 WL 225076 at *1.

In addition to the issues the court asked the parties to address, Defendant Glass argues that the court should dismiss plaintiff's DCI claim because plaintiff has represented to defense counsel that he will not testify at the trial. Plaintiff bears the burden of proof on his claim. It is difficult to imagine how plaintiff could meet that burden without offering his own testimony. Nevertheless, dismissal at this point would be premature. Defendant Glass is free to move for dismissal at the close of plaintiff's evidence should he believe that plaintiff has not offered enough evidence to

---

[2]If there are additional witnesses plaintiff believes have relevant testimony to offer on the claims that remain, he must advise the court and provide a summary of their expected testimony and explain why it is relevant.

20

support a finding in his favor. In this respect, plaintiff is in no different position than a person who is not in prison who wishes to start a lawsuit.

## C. Pending Motions

On March 13, 2006, plaintiff filed a motion to vacate the judgment pursuant to Fed. R. Civ. P. 60(b), as well as a motion for recusal and a motion for change in venue. The basis for plaintiff's Rule 60 motion and motion for recusal is his discovery that I was appointed as a "special prosecutor" by the State of Wisconsin in 1992. Even assuming that this is "newly discovered evidence which by due diligence could not have been discovered in time to move for a new trial under Rule 59(b)," a judge's former employment with a party or victim does not constitute grounds for recusal. *United States v. Ramusack*, 928 F.2d 780, 784 (7th Cir. 1991). Plaintiff's motion to vacate and motion for recusal are therefore denied.

Plaintiff has also moved to change the venue of this case to the Western District of Wisconsin. As grounds for the motion, plaintiff asserts that he himself, together with the majority of the witnesses to be called at trial, reside in the Western District.[3] While the convenience of witnesses can provide grounds for transfer, the court is not convinced that the majority of the witnesses on plaintiff's DCI claim reside in the Western District. More importantly, this case has been pending in this district for nearly two years. The trial date is fast approaching, and it is simply too late in the day to change venue. *See Nagle v. Pennsylvania R. Co.*, 89 F. Supp. 822, 823 (N.D. Ohio 1950) ("[A party] who seeks a change of venue must act with reasonable promptness, and if he . . . delays until shortly before trial, the interest of justice in early trials overcomes any

---

[3]After filing this action, plaintiff was transferred from OSCI (in the Eastern District) to Oakhill Correctional Institute (in the Western District).

convenience to the parties which might result from a change of venue."). Accordingly, plaintiff's motion to change venue is denied.

Finally, plaintiff has filed a motion for an injunction ordering prison officials statewide, including those at the Oakhill Correctional Institution, to provide him with the same sort of kosher food that federal prison inmates receive. The court has already dismissed plaintiff's claims concerning the alleged inadequacy of the "kosher" diet he has received since leaving DCI because plaintiff failed to exhaust his administrative remedies. (Order of March 28 at 19.) Furthermore, nothing in federal law entitles plaintiff to the same menu that federal prisoners receive. Plaintiff's motion is therefore denied.

**IT IS THEREFORE ORDERED** the court's previous decision dismissing plaintiff's claims against all of the defendants other than Defendant Glass is confirmed, but that plaintiff's complaint is now construed to include a claim under RLUIPA;

**IT IS FURTHER ORDERED** that upon plaintiff's request, the clerk shall issue six subpoenas in blank to plaintiff, but that plaintiff is required to pay witness fees and expenses;

**IT IS FURTHER ORDERED** that plaintiff's motions for recusal (docket # 138), change of venue (docket # 136), and for an injunction (docket # 144) are denied.

The clerk shall set this matter on for further telephone pretrial conference within thirty days of the date of this Order.

Dated this   4th   day of April, 2006.

s/ William C. Griesbach
William C. Griesbach
United States District Judge

22